The matter or the question I think that brings us here today is, I would characterize it as the District Court's treatment of this case at the summary judgment level. The District Court, I think the attitude can be summed up by some of the District Court's questioning during oral argument. The question was asked, why isn't this basically the mousetrap issue? If you have a better mousetrap that you have developed, why can't you do with it as you please and charge what you please for it? And that was the level of analysis or the analysis that was applied to this case. And I think that is superficial and inappropriate in this case. Why couldn't your client have built another plant? There are several reasons. Number one is the cost. What was the cost? Was it under a million, close to a million? Approximately a million dollars to build that plant. Well, all right. Why not do it then? Have a million dollars. We're not — First American is essentially, if you will, the Microsoft of the title industry. Intercounty Title Company of Nevada is moving into the Washoe County market. There are, at that point in time, basically five. All right. But you don't have the money to go into the business. That's too bad. But a lot of people don't have money to go into businesses. It's the issue of we have the money to go into the business, but for the artificial setting of the price to allow us to go. Isn't it artificial? It's like you get your mousetrap someplace else. It's not a mousetrap. That's the problem with the analysis. It's not a thing that you can go someplace else. Sure, it's a thing. I'm sorry? Sure, it's a thing. Not really. It's a method or an — it's like saying the windows. Windows program is a thing. Microsoft developed this, and it's much like the Microsoft case. I think Judge Selna was involved in. The issue is you have this technology, if you will, or this methodology of analyzing the data that's available in the market. That is essentially the thing. And the consortium, as FATCO called it, controls access to this thing. The — in the case where Microsoft has access and controls the code to allow people to write programs that would function under Windows, you have the same thing here. You have the consortium that has the ability to arbitrarily set the price as to who is going to be able to use the database. Well, you can always get the raw data. You have the raw data. In fact, you're doing business and you're doing, you know, your market share is increasing and everything else. Well, that's a bit of a red herring. Well, I — you can get the raw data. And we have the raw data. And you have the raw data. And you can use the raw data. And we can use the raw data. You want the raw data in a specific form. Yes. And that is a competitive advantage to having that raw data in that specific form. Be more efficient for you. Yes. Exactly. And everybody else has the data in that form at a price substantially less than we would have to pay for that data. The existing members of the consortium paid approximately $3,000 or less a month to obtain that data contractually from DataTrace. DataTrace is the entity that developed the portion of that data that we're interested here, the 79 forward, what's been called the back plan. They — I lost my train of thought there. The — DataTrace develops this particular data and then sells it under contract to the other members of the consortium. And we wanted to basically to buy into that. And there's a contractual formula to allow you to do that. The other members at the time we come along say, well, first they say, yeah, you can buy in. Our contracts as DataTraces are agent for negotiating that and doing that under this contractual formula. And DataTrace is a partially owned subsidiary of the FATCO parent. And they are, as I say, kind of the big dog in the title industry. They have this method of processing that data that saves you a considerable amount of time and expense in processing that data when somebody comes through the door and wants to do a real estate transaction. But isn't that the tradeoff? You make a big capital investment up front and you can incrementally do these searches cheaper as opposed to not having the capital cost and spending a little bit more for the searches. I don't think so, Your Honor. The big capital contribution is nobody else was required to make that big capital contribution other than us. We would have to have a million dollars put in to play in this market. And the observation was made that, well, you know, we could play and we're playing and our market share was increasing. Well, that's just and they want to characterize it. Well, what's the problem? Business is booming. And that's just spin. It should be preceded, I think, depending on your political persuasion by, you know, I'm running for President and I endorse this message that business is booming. Well, business is not booming. Are the statistics quoted by the appellee incorrect as to your business after you lost access to the back plan? They're yes and no. They're misleading. To say where our share was increasing and so on and after we lost access. I mean, the company was at that time working and attempting to, you know, to develop their sales. They're new into the market. I mean, you know, they open the doors and they have no business. And you get your sales force out and you get escrow officers and, you know, naturally your market and your share is going to increase. This matter, it's been about a year and a half since the summary judgment was filed and the record was closed. It's been almost exactly, I think, a year today that the district court entered a summary judgment motion. And since that time, our market share has gone to zero. We're out of business. The ñ and they could not compete effectively and properly in this market. The ñ kind of getting back to the ñ how the district court treated this matter, they come to ñ they start out with this mousetrap concept, which I think is inapplicable. We are not, you know, talking about just a thing that's an off-the-shelf product or process that you can get anyplace. The district court, in its order, and I think erroneously, finds that while there's other title companies, they make the statement that there's other title companies in the market that are not using this ñ this back plant. And I don't, quite frankly, know where that came from. There are no other title companies in Washoe County that are ñ that are conducting business not using the 79 Forward Back plant. The only successful operations have that plant. And it's an issue of under who controls access to this plant. And it's ñ and it's the consortium and DataTrace contractually. And they have the ability to set the amount. The district court found in its first funding under the Section 1 findings that we did not meet the test of ñ of the agreement prong. And ñ District court was clearly wrong on that. There was an agreement, wasn't there? Contractually, there was an agreement that ñ No, you can skip that one. Very good.  I will. Then we go to basically down to the ñ to the second portion, the unreasonable restraints and the rule of reason portion of the test. And again, the district court is ñ I find kind of remarkable that their ñ its order is silent on the factual issues on the ñ the restraint of trade and the competition. We have in the record the statements of the consortium agent, DataTrace, that, first of all, Mr. Castillo, when they set the original price of $6 million, says you can't do that. You're going to face antitrust challenges. He advises them. They're cognizant. Well, maybe they took his advice and were persuaded by his ñ by his concern. And they substantially lowered the price. So it's now down to a million. And now we're playing the numbers game. What can we get away with? The numbers are quite relevant. I'm sorry? The numbers are relevant. And to me, that's the factual heart of the determination. And that's a question of fact for somebody to decide, not the judge sitting at a summary judgment level. But the reasonableness inherent within that concept of was that a reasonable price for entry to the market. But what facts show that that was ñ that are in dispute that would show that that is unreasonable ñ was an unreasonable ñ led to an unreasonable restraint? Okay. You have at ñ you have Mr. Hellwig, the owner of the Founders Title Company, one of the consortium members, stating at the ñ in the State court proceedings, the other ñ the trade secret proceedings, that basically this ñ number one, you need to have the title plant to be competitive in this market. And the ñ they try to justify after the fact that this $1 million is the same as it would cost to generate this ñ this title plant in an offshore facility. I thought that's what you said yourself. You said that yourself a little earlier. I did, yes. But I think that's coincidental, that if you had ñ Well, I mean, you're not disputing it. It's a reasonable figure. Yes. But that's not the buy-in figure in other markets. The cost of replacement or cost of creation is not the same as what it would reasonably cost you to buy in to have access and use that ñ How do we know that? We know that by Mr. Hellwig's testimony. What did he say? What did he testify? He testified that in other markets, when you buy in, it is not reasonable and customary that you receive the whole cost of that plant for somebody to participate in the use of that plant. It's not like you're buying ñ now, if InterCounty came in, you would have six title companies competing in that plant, in that market, using one plant. And what you're saying is you would have InterCounty pay the whole price of that plant. That isn't what we know. What we know is this is what it would cost to build another plant. We don't know that a million is the cost of the ñ of this particular plant. Yes. Isn't the record of something like 3.6 million over the years invested? I'm sorry? Over the years invested to get to where they were in 2000? Not per member. No, but total cost. And that was part of the confusion. The contract calls for this formula in determining the price, which the consortium members had the option under the contract to totally ignore, which they did. And Mr. Castillo, the data trace representative, came up with a range of formulas at some point in time that was something, well, less than a million dollars to 6 million dollars. And one of his analyses is that there was this sum of something like 3 point something million dollars paid in. Historical cost paid in. And I think that was an aggregate. But if you look at his computation and you break it down on a per month basis, which is how they analyzed this, it was somewhere around 2 to 3 thousand dollars a month that the individual participants had paid in. And if you look at what they finally say they offered to InterCounty, InterCounty would have had to pay something in excess of 8 thousand dollars a month to buy into the same thing they'd paid 3 thousand or less to obtain. Plus, they got to make these payments over time, over a period of roughly 20 years. And those payments had varied significantly. Sometimes, I think Mr. Castillo testified, they were as low as $1,400 a month. And so there was a difference. Kennedy, your complaint seems to be you went in on the ground floor and so you're treated a little differently. That's not an antitrust case. Well, it is if the, if you have, again, you have this base, this function that has been created that everybody else has that allows them to compete at a certain level at a certain cost. And you have a function that says, you know, you have to let other people in and to play on the same field, but you control that entry by setting the price unreasonably  And what we're saying is, you know, I think the key analysis here is unreasonably somebody has to determine whether that number is unreasonable or reasonable, and that was not a function of the district court at the summary judgment level. One other aside is you have by statute in Nevada, NRS 692a.230, which is under the title plant operator, has to get a license in the State of Nevada. And one of the things they have to show to the insurance commissioner in Nevada is under what circumstances you will admit new members to this title plant, and you have to demonstrate to the insurance commissioner that this admission criteria is not anti-competitive. So is this a State case you have that you bring into Nevada court? Well, the State case is What's the relevance of that to a Federal antitrust case? The relevance is you have a mechanism that to get into this industry, there is a procedure for buying in, both statutorily and contractually under the data trace contracts. But under the statutory scheme, one of the things you would have to demonstrate is that the entrance requirements are not anti-competitive. And I think that the That would be a Nevada case, would it not? Yes. And no one has ever raised that that issue has been raised. The insurance commissioner in Nevada has never enforced that. No one has ever been licensed under that. But what did your client represent to the Nevada authorities when they got their license? That's another whole issue. The FATCO and the consortium want to say that we represented to the Nevada State insurance commissioner to get our license, that we had the ability or that we were going to compete without using the back plan. You made that representation, is that right? No. Well, how did you get the license? The representations that were made is that searching could be done using the grant or grantee index. The Mr. Ormsby, when he applied for the license, always intended that he would have and obtain this back plan access. And there's much made of the statements that it would. So he made the representation that he would get it, not knowing whether he could or couldn't. Well, he believed he could based on his negotiations with DataTrace. He starts out going to DataTrace and Mr. Castillo, and he says, Mr. Castillo tells him that, you know, I'm going to get you a good price, I'm going to get you a good deal. We do it. Comes back at $6 million. And Mr. Ormsby and Mr. Castillo say, well, that's absurd. But he went right ahead and told the Nevada Licensing Authority that he could do it before he knew whether he could or couldn't. He believed it was possible based on his... Believed isn't much of a basis. He speculated. I don't. He's going into a new business. He's experiencing the business in other jurisdictions, and his discussions with DataTrace are that he's going to be able to obtain this at a range in price that he believes is acceptable and he can do business under. That comes back at $6 million. It sounds to me just like a straight misrepresentation. At just taking, carving that out and saying, yeah, you told me this and here's the way it turns out, yes. But, I mean, I don't think you can just carve out that little bit of the discussion from the concept of who gets to participate in the use of the database as a whole. The statements by Mr. Ormsby are to the effect that it was feasible to conduct a title search using the grantor-grantee index. Didn't he basically represent to the State in order to get the license that he had the capability to do the job based on access to the county records? Yes. You can do that. And I assume the State required a minimum level of competence to perform the duties before they would give him the license. Yes. And he represented on the basis of the county records he could do that. Yes. I mean, you can conduct. I mean, there's no question. You can take the grantor-grantee index and conduct a title search. And that is, quote, unquote, feasible. It is possible. But it's also possible under the Microsoft scenario that you can go write programs that compete with Windows. Whether or not you're going to survive in that industry is a wholly separate issue. And that's why we're here. He always believed that he would be having access to the back plant at a reasonable price when he applied for his license. And I would like to serve my 15 seconds. Do you like to save your 15 seconds for rebuttal? Yes. All right. We'll allow you to have a minute. Thank you. May it please the Court. Richard Nelson on behalf of the Applebee's Data Trace Information Services and Nevada, I'm sorry, First Data, First American Title Company of Nevada. At counsel's table is Alice Mercado, who's counsel for Founders Title Company of Nevada. And she ceded her time to me. Your Honors, this is a commercial dispute. It's not an antitrust case. It's a question of whether the $1 million price that was asked for this title plant is a reasonable price. The Court never reaches that point and need not reach that point unless there is an antitrust component to the case. The only way that the Court would get there is if this is an essential facility. And as the district court properly ruled, based on the very unique evidence in this case, it is not an essential facility. It's an unusual. The Section 1 claim doesn't depend on an essential facility, does it? That's correct, Your Honor. That's correct. Although, Section 1, you would need to show competitive injury. Do we have any evidence in the record that consumers are paying more or have less access to service as a result of the way the members have been running the back plant? No, Your Honor. There's absolutely no evidence in the record regarding pricing in Washoe County, no evidence whether the prices for title insurance in Washoe County is higher than the neighboring counties, lower than the neighboring counties, no evidence whatsoever. And that's the unusual aspect of this case, is there is no evidence regarding the product market in Washoe County, the competitive balance within Washoe County, how the title plants affect that competitive balance in Washoe County, any kind of harm to competition as a result of these title companies getting together, pooling their resources, investing some $3.8 million over a span of years to create an asset, a better mousetrap, as Judge Hagan called it. But the critical component is that any other competitor could have come in and built their own title plant. They could have built a geographic title plant offshore, as InterCounty Title Company explored doing. They knew the price for building it offshore. It's an undisputed fact that they explored building their own joint venture with two other title companies and building their own geographic title plant. That's one option. That's one way to do title searches. Another option is to use the grantor-grantee records that are available in the county courthouse. That's the way that it's done in many states in this country. In this case, it's not a hypothetical about whether InterCounty Title could do grantor-grantee searches in Washoe County. They did do grantor-grantee searches in Washoe County. When they lost access to the geographic title plant in May 2002, if the geographic title plant is indeed an essential facility, one would have expected their business to plummet, their ability to service their customers to disappear. That is not what happened. What they experienced was after May of 2002, their business increased. It increased 50 to 60 percent through the end of discovery, which was basically the end of October of 2002. So for those five months, their business boomed using the alternative system. Unlike Terminal Railroad, there is multiple ways to do this process. As the Court has pointed out, they did represent to the State of Nevada that they would be using this grantor-grantee title plant, augmented by sort of online access, and what Mr. Ormsby, the president of InterCounty Title Company, testified. That's exactly what they did. They had their grantor-grantee records. They are a member of the consortium. That's the irony here. They are a member of the title plant from the period of 2000 forward, and that's exactly the type of title plant that they represented to the State that they would have and they were using. There is no denial of access here. The question here is whether ---- Doesn't Metronet say you don't have to have an absolute denial if you price admission too high? Well, Metronet, of course, has been reversed or vacated by the Supreme Court, but the concept I think is true, though. I think that it's actually true, that if you have an essential facility, and if indeed there's evidence that there's an essential facility, then the competitors would have to, the ones that control the essential facility, according to Terminal Railroad and Associated Press, would have to give access to that on terms that are reasonable. And if the terms were unreasonable, that's effectively denying access. I don't dispute that concept. You know, here there's two issues before we even get there. One is whether this is an essential facility, and as we've argued, it is not. They could have chosen to price it whatever they wanted to price it. As Trinko said, there is no duty for competitors to share their advantages with their competitors, unless there's an exception to that. There's no duty to deal unless there's an exception. And an exception would be in the case of Terminal Railroad, in the case of Associated Press, if there was an essential facility that was necessary in order to compete, there may be a requirement to deal. And so that's the first step that Intercounty Title doesn't really overcome, because they have proven that they can compete without access to this particular title plant. Then with regard to the second step, is if they had established that the only way to compete in Washoe County was by having access to this plant, then a question would have been is whether this price was reasonable. And the evidence, I believe, and I think Judge Hagan concluded, certainly didn't establish that this price was unreasonable. And that's their burden, to establish that it's unreasonable. How did they arrive at this price of $1 million? It's based on the offshore build price, that in order to create the plant from scratch offshore, which is where a lot of these things are happening, it would cost approximately $1 million. So if somebody wants to create it, it would cost $1 million, and therefore, they charge $1 million as opposed to the $6 million or $3.8 million. Now, I don't know if counsel seemed to argue that it was the custom and practice of the industry not to charge that kind of pervasive new entrance fee in that manner. That's correct. That is what counsel argued. Is there anything in the record that supports that? Absolutely, Your Honor. In fact, there are undisputed facts in the record that at exactly the same time period, in the beginning of 2000, when this price was being established for the Washoe County title plant, a group in Carson City County, the neighboring county in Nevada, also had a geographic title plant, also being run by DataTrace, first American title company, ironically, wanted to enter Carson City County. And they approached Carson City County and said, we want to buy into your title plant. DataTrace had exactly the same problem. It was exactly the same kind of confusing contract language, which for Carson City County, a very small county, would have priced the plant at $600,000, very expensive for that county. DataTrace said the offshore build price is $150,000. So the members of that title plant said, we'll charge $200,000, something more than the offshore build price. First American title said, wait a minute, it's $150,000 for the offshore build price. Why can't we pay that? And they eventually decided on $175,000. So, in fact, when first American title company of Nevada was part of the group deciding how to price the Washoe County plant, they had already agreed to pay the offshore build price, actually a premium on the offshore build price in the neighboring county. And that's an undisputed fact. So, you know, so we believe that this is not unreasonably priced. We believe this is not an essential facility. And, moreover, we believe that there is absolutely no evidence, not a shred of evidence in the record after full discovery, that there was any impact or injury to competition in Washoe County. The only injury to competition that InterCounty Title Company points to is injury to itself, that somehow for a period from beginning 2000 to middle of 2002, that their processing costs were $130,000 more than they would have otherwise been. It's a little confusing because they had access to the full geographic title plan for the vast majority of that time. But, nevertheless, their focus is on the injury to InterCounty Title Company. And, of course, the court's cases have clearly established, Paladin, McDaniel, Tanaka, that that's not enough, that an antitrust plaintiff has to come forward with evidence of an injury to competition in general. And which generally requires evidence of an increase in the price that would otherwise have been paid if there was a competitive marketplace or a decrease in output. Neither of those factors are present here. The plaintiff has made no effort whatsoever to establish any of those factors. So we're left with a competitor who decided that it wanted to pay $400,000 for something that the group wanted to charge a million dollars. It didn't want, it chose not to pay that. It chose not to build its own geographic title plan. It chose to do its business using the grant or grantee title plan that it had. And it competed successfully. And those are unusual facts in antitrust cases. There's also one other unusual fact I'd like to point out to the court, which is along with the failure by InterCounty Title Company to establish what the product market is, I'd like to point the court's attention to the supplemental excerpt of the record on page 453. And InterCounty Title Company's response to undisputed fact number 67, in which InterCounty Title Company surprisingly, in this sort of context, in reference to Founders Title Company, notes that deposition testimony from Mr. Ormsby, we're not really competing for the same business that I'm aware of, in reference to Founders. They have no operation up at Incline Office at this time, so we're not in competition there. No geographic market. We're not in any competition in the subdivision or commercial industrial area arena that I'm aware of. So with regard to one of the appellees, the evidence is to the contrary, that there's even a market definition that would even allow a determination that there's an antitrust injury. So unless there's any further questions, what we would submit is that the InterCounty Title Company has failed to establish elements, essential elements on Section 1 or Section 2, and has not established any injury to competition. Thank you. Thank you, Counsel. I think two quick points set forth in Counsel's argument. Number one, in answer to a question that Selma asked is about the use of the grantor-grantee index and the representations made to the State. One of the representations made was that the grantor-grantee index could be used as augmented by the computerized plan. InterCounty Title Company did. The back plan is on computer. It is available through phone link. And InterCounty did have that augmentation and did have that access back to 1979 until it was revoked by DataTrace when we complained about the price. The second issue is the issue of the amount, the issue of Carson City was raised. It was FATCO that paid the inflated price to get into Carson City, and they paid a premium based on uncertain time factors. The appropriate analysis, I think, if you look at Mr. Tidd's testimony when he talks about the Las Vegas market, he said, what do you want, $3 million for this? I can get into Las Vegas, which is a market four to six times bigger and would have a replacement cost of much more than the Reno market. He says, I can get into Las Vegas. He never got a firm offer at $3 million, did he? No, he did not. The statement was, and it goes to the anticompetition injury, was, and this is the statement of the representative of DataTrace that he made not only to Mr. Tidd, but he missed making it to other individuals that inquire about the price to get into Washoe County, that the price we're quoting you is set by the consortium to discourage competition. And based upon the quote, you know, he just goes away. He says, you know, this is ridiculous. I'm not going to pay that money to play in this market when I can go spend that less money someplace else and get into a bigger market. And that is a competitive injury. Now, you have not only Mr. Tidd declining to participate, you have the imposition imposed on your county title company, and I guess I'm through. Thank you. The matter will stand submitted, and that completes our calendar for today and for the week. And thank you all very much. Thank you. Thank you. Thank you. Thank you.
judges: Noonan, Paez, Selna